UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ANTHONY OWENSBY,               )
                               )
              Plaintiff        )
                               )
         v.                    )    Case No. 2:06-cv-310
                               )
COMMISSIONER OF                )
SOCIAL SECURITY                )
                               )
              Defendant        )

OPINION AND ORDER

This matter is before the Court on the Petition for Judicial Review of the Decision of the Commissioner of Social Security filed by the plaintiff, Anthony Owensby, on March 14, 2007. For the reasons set forth below, the decision of the Commissioner is **REVERSED** and **REMANDED**.

Background

The plaintiff, Anthony Owensby, applied for Disability Insurance Benefits on February 27, 2004, alleging a disability onset date of December 1, 2001. (Tr. 74) The claim was denied initially on April 22, 2004, and upon reconsideration on August 17, 2004. (Tr. 24, 31) Owensby requested a hearing on September 22, 2004. (Tr. 35) On March 2, 2006, a hearing was held before Administrative Law Judge ("ALJ") Robert G. White. (Tr. 149) Although the transcript states the hearing was held in "Gary-Orlando, Florida" and that Owensby appeared "in person" (Tr. 149), the ALJ states in his decision that he presided over a video hearing from Orland Park, Illinois and that Owensby appeared at a teleconference center in Gary, Indiana. (Tr. 14)

Vocational Expert ("VE") Christopher Yep testified. (Tr. 167)
Owensby testified without the assistance of an attorney or other
representative. (Tr. 149)  On March 13, 2006, the ALJ denied
Owensby's application by written decision. (Tr. 14-19)  Following
a denial of his request for review by the Appeals Council on July
17, 2006 (Tr. 6), Owensby filed a complaint in this court on
September 8, 2006.

Anthony Owensby was born on January 4, 1952. (Tr. 74)  The
highest level of school he completed was the 12th grade. (Tr. 92)
At the alleged disability onset date, Owensby was 49 years old.
The ALJ found that during the period under review, Owensby became
a person approaching advanced age of 50-54. (Tr. 18)  Owensby has
a history of clerical jobs beginning with the U.S. Army in 1974,
and continuing with several similar positions over the subsequent
ten years. (Tr. 113)  From 1985 through 2001, Owensby worked as a
"mark up clerk" for the United States Postal Service. (Tr. 89)
In addition to data entry, Owensby was required to carry bins of
packages and bulk mail that weighed between 20 and 40 pounds.
(Tr. 151-153, 90)  During an eight hour shift, Owensby sat for
approximately four hours a day and stood or walked for approxi-
mately four hours a day. (Tr. 151)

In July 1989, Owensby was injured at work while pushing one
of the trucks to a weigh station. (Tr. 154)  He stayed home for
approximately 48 hours because he "couldn't move." (Tr. 154)
Owensby alleged his health complications began at this time. (Tr.
154)  Owensby eventually began seeing a chiropractor for his

2

condition, and the first medical report in the record, dated March 11, 1989, is from Calvin R. George, D.C. (Tr. 123-124)  Dr. George described Owensby's "serious health condition" as acute low back pain associated with segmental dysfunction (verebral subluxation), acute neck and upper back pain with associated brachial neuralgia and parasthesia in the hands, and severe, permanent bilateral pronation that affected Owensby's walking gait. (Tr. 123) Dr. George also noted that Owensby might have to take from a few days to several days off at a time during acute exacerbations. (Tr. 123) Dr.George recommended CMT, HVG, Cryo-therapy, IST nutritional therapy, spinal rehab, and corrective orthotics for feet pronation. (Tr. 124)  Nothing in the record indicates Owensby received the recommended treatments.  However, according to Owensby, he did seek additional chiropractic help but could not find a good chiropractor. (Tr. 129) Owensby stated that his condition continued to deteriorate to the point he was having difficulty getting through the entire day due to pain. (Tr. 129)

The record contains no further evidence of treatment until early 2001, almost 12 years after his work injury. A diagnostic imaging procedure was ordered on April 24, 2001, and Dr. M. Nawaz, M.D., dictated the results on April 25, 2001. (Tr. 132) The procedure showed normal curvature of the cervical spine with no fractures or subluxation. (Tr. 132) The results also showed disk space as being narrowed at C3-4, C4-5, C5-6, C6-7 and C7-T1. (Tr. 132)  Spondylosis was seen on the basis of degenerative

arthritis at C3-4, C4-5, C5-6, and C6-7. (Tr. 132)  The results were forwarded to Danada Family Medicine on May 2, 2001, but it appears from a note on the bottom of the page that the results were not reviewed by a practitioner at Danada until May 3, 2001. (Tr. 132)  Thus, this review occurred a day after Owensby was examined by Dr. Enrique G. Saguil, M.D. regarding his chronic neck and back pain. (Tr. 128-31)  Pursuant to the examination, Dr. Saguil noted that Owensby's neck range of motion was full without limitations. (Tr. 129)  He also noted some mild pain to palpation of the cervical spine at the spinous process of about C3-4, C4-5. (Tr. 129)  No step-off was noted. (Tr. 129)  Deep tissue reflexes, sensory examination, and motor strength were described within normal limits to both upper and lower extremities. (Tr. 130)  However, Dr. Saguil noted that there was pain to palpation of Owensby's right trapezius compared to the left and irritation at the rhomboids. (Tr. 130) Dr. Saguil suggested physical therapy. (Tr. 130)  He also suggested exercising, home education, massage, and work hardening. (Tr. 130) Dr. Saguil stated that there was no need for medication, but he noted that an MRI of Owensby's neck would be considered if the "x-rays look questionable" or the numbness and tingling continued to worsen. (Tr. 130)

On November 30, 2001, Owensby was fired from his job of 16 years as a mail clerk at the USPS for failure to maintain a regular schedule. (Tr. 154)  Other than brief stints working as a Yellow Pages telephone book delivery person and a taxi driver,

Owensby has not worked since December 1, 2001. (Tr. 94)  There is
a gap in the record until Owensby filed for disability benefits
on February 27, 2004. (Tr. 74)  On March 17, 2004, Owensby met
with C. Buckhoy for a face-to-face interview at a Social Security
Administration field office. (Tr. 85)  Buckhoy noticed no obvious
impairments during the interview. (Tr. 86)

On March 25, 2004, Owensby was examined by Dr. Chirag Patel,
M.D., of Physicians' Management West, Inc. (Tr. 133-136)  The
examination lasted 15 minutes. (Tr. 133) Dr. Patel noted that
Owensby was well-built and had a normal appearance. (Tr. 133)
Dr. Patel stated that Owensby's cervical spine had a full range
of motion including lateral movement and minimal cervical spine
tenderness. (Tr. 133)  No deformity of the lumbar spine was
noted, and there was normal lumbar curvature with no muscle spasm
or tenderness. (Tr. 134-35)  Owensby's range of motion was within
normal limits with flexion 90 degrees, extension 30 degrees, and
right and left lateral flexion twenty-five degrees. (Tr. 135)
His straight leg raise was normal in both legs. (Tr. 135) Dr.
Patel noted a full range of motion of all of Owensby's joints.
(Tr. 135)  He was able to bear his own weight, heel walk and toe
walk, and squat down. (Tr. 135)  His gait was normal, and he did
not need assistance to walk. (Tr. 135)  Owensby's finger grasp
and hand grip were unimpaired. (Tr. 135)  He showed normal
neurological functioning with no twitching or involuntary move-
ment. (Tr. 135)  Owensby demonstrated normal deep tendon reflexes
and sensory responses. (Tr. 135)  His motor strength was normal

in both upper and lower extremities. (Tr. 135)  Owensby displayed normal behavior throughout the examination and was able to relate. (Tr. 135)  In the clinical impression segment of the report, Dr. Patel noted that Owensby had an inability to hold his head up for more than four to five hours. (Tr. 136) Dr. Patel did not review the results of the April 2001 x-ray as "[t]here was no information sent by the Bureau of Disability Determination Services." (Tr. 133)

On April 10, 2004, Owensby completed an "Activities of Daily Living" questionnaire. (Tr. 102-106)  He stated that his arms and fingers went numb after doing any physical activity, causing him to drop things. (Tr. 103)  Owensby also described bladder control and sleeping problems. (Tr. 103)  Owensby described pain on his right side "like a surge of current" at least once a day. (Tr. 103)  Owensby next stated that the pain in his left shoulder and arms was a constant ache with a sharp pain occasionally. (Tr. 103)  Owensby complained of a painful and stiff neck with limited mobility when he moved his head. (Tr. 103)  Owensby also described pain in his right knee, calf, ankle, and middle upper body. (Tr. 103) In response to the question of whether he was able to sit for at least two hours, Owensby stated that his right upper back hurt and his ankles and legs lost circulation when sitting. (Tr. 104)  Finally, Owensby stated that he needed to take rest periods throughout the day. (Tr. 104)

On April 12, 2004, Dr. Reynaldo Gotanco, M.D., a state agency physician, completed a Determination Statement in which he

found that Owensby's impairment, a "pinched nerve," was "non-severe." (Tr. 137)  He concluded that Owensby's allegation of a "spinal nerve condition" was not supported by the findings of the consultative examination. (Tr. 137) Dr. Gotanco noted that Owensby did not have any neurological deficit of the upper and lower extremities and that Owensby had normal motor strength in the upper and lower extremities, a full range of motion of all joints, was able to raise both legs normally, bear his own weight, and walk normally. (Tr. 137)

On August 5, 2004, Dr. Virgilio Pilapal, M.D., a state agency physician, reviewed Owensby's medical records and found that his impairment, "verebral subluxation," was "non-severe." (Tr. 138) Dr. Pilapal stated that Owensby's allegations were not supported by the medical findings. (Tr. 138)  He noted that range of motion was within normal limits in the cervical and lumbar spine, that reflexes were normal, and that there was minimal cervical spine tenderness without muscle fasciculation. (Tr. 138) He also noted that motor strength in the upper and lower extremities was normal. (Tr. 138)

On September 13, 2004, Owensby again filed a disability report appeal. (Tr. 114)  He stated that it took him extra time to perform tasks such as washing and eating. (Tr. 118)  Owensby also indicated that he no longer interacted or went out as much since he last completed a disability report. (Tr. 118)  He indicated he was unable to work in the clerical/data entry field.

(Tr. 120)  Owensby also stated that he would be homeless soon.
(Tr. 118)

On September 22, 2004, Owensby requested a hearing before an
ALJ.  On November 3, 2004, a letter from the Social Security
Administration was sent to Owensby at a former address in La
Grange, IL. (Tr. 20)  This letter explained the hearing process
and also briefly explained his right to representation. (Tr. 20-
21)  In a section entitled "Your Right to Representation," the
letter stated the following:

> You may choose to be represented by a lawyer
> or other person.  A representative can help
> you get evidence, prepare for the hearing,
> and present your case at the hearing.  If you
> decide to have a representative, you should
> find one immediately so that he or she can
> start preparing your case.  Some private
> lawyers charge a fee only if you receive
> benefits.  Some organizations may be able to
> represent you free of charge.  Your represen-
> tative may not charge or receive any fee
> unless we approve it.  We have enclosed the
> leaflet "Social Security and Your Right to
> Representation."  We are also enclosing a
> list of groups that can help you find a rep-
> resentative.  If you get a representative,
> you or that person should call us to give us
> his or her name, address and telephone num-
> ber.  You will also need to complete our Form
> SSA 1696-U4 Appointment of Representative.
> Any local Social Security office can give you
> this form.

> (Tr. 20-21)

The list of groups is not provided anywhere in the record nor is
a copy of the referenced leaflet.  In June 2005, the record shows
that Owensby was appointed an advocate for the disabled named
Tamara Pusateri. (Tr. 38)  Pusateri is not an attorney. (Tr. 38)

8

On November 2, 2005, Owensby was examined by Dr. Jonathan R. Javors, D.O. (Tr. 139)  Dr. Javors indicated Owensby had issues with his neck and, to a lesser degree, with his back. (Tr. 139) Dr. Javors noted that Owensby's neck caused him pain all the time and was aggravated when he sat in one position. (Tr. 139)  It also was noted that Owensby's back bothered him when he tried to lift something heavy or if he had to stand for a long period of time in one place. (Tr. 139) Dr. Javors indicated Owensby took Ibuprofen for his symptoms and did no home exercises. (Tr. 139) Dr. Javors stated that Owensby had no difficulty rising from the sitting position to the standing position, did not appear to be in any distress, had good toe and heel gate, and showed good straight leg raising. (Tr. 140)  His arm, scapular thoracic, and glenohumeral motions were normal as were his deep tendon re- flexes. (Tr. 140) However, Dr. Javors noted that Owensby had some limitation to the range of motion of his neck. (Tr. 140) Dr. Javors also examined the x-rays and found significant degenera- tive arthritis of the cervical spine, significant degenerative arthritis of the lumbar spine, and possible hyperostosis skeletal hypertrophy. (Tr. 141) Dr. Javors recommended that Owensby continue to take anti-inflammatory medicine and participate in a physical therapy home exercise program. (Tr. 141) Dr. Javors indicated the following:

> There are many occupations that [Owensby] can
> perform, however, there are certain ones he
> needs to avoid.  Specifically, I would not
> recommend any job where he would need to work
> over shoulder level.  I would also not recom-

9

> mend anything involving repetitive, constant,
> or frequent bending, lifting, or twisting to
> the lower back, and no lifting up over twenty
> pounds.  Also, sitting in one position, espe-
> cially such as working on a keyboard, would
> most likely cause significant symptoms to his
> cervical spine.  However, there are quite a
> few things that he would be able to do, and I
> would like to discuss this with Mr. Ransom.

(Tr. 141)

There is no indication of any such conversation in the record,
and Ransom is not mentioned at any other point in the record
either previously or subsequently.  Other than the five sentences
quoted above, there is no residual functional capacity ("RFC")
evaluation provided in the record by a medically examining
source.  Dr. Javors released Owensby from his care and agreed to
see him on an as needed basis. (Tr. 141)

At some time in 2005, Owensby became homeless.  A Report of
Contact form dated December 7, 2005, states that "Attorney [sic]
Tamara Pusateri called concerning Mr. Owensby." (Tr. 56)  Pusa-
teri indicated that she believed him to be homeless because a
mission address in Hammond, Indiana was used on the 1696 form
dated June 13, 2005. (Tr. 38)  Two different homeless missions
were mentioned, but Pusateri stated she could not contact Owensby
at either one[1]. (Tr. 56)  A handwritten note on the Report of
Contact form indicates that the unknown author of the note called

---

[1]The form goes on to say that "Pusateri stated that if she doesnít hear
from [Owensby] she would fax us a letter of withdrawal from his case." (Tr.
56) The record is unclear on what happened to Pusateri after this date. No
faxed letter is included in the record showing that she withdrew from
representation or was asked by Owensby to withdraw. In any event, Pusateri was
not present for the hearing, and Owensby was unrepresented.

10

the mission later that day and spoke with Owensby.   During the discussion, Owensby indicated that he had not been notified of the hearing even though he had given Pusateri his current address at the Indiana mission in May 2005.   On February 6, 2006, a second Notice of Hearing was sent to Owensby at the correct address for the Rescue Mission in Hammond, Indiana.   Owensby acknowledged receipt of the notice on February 9, 2006 and indicated that he recently had moved again. (Tr. 73)

Owensby's hearing took place on March 2, 2006[2]. (Tr. 147) The hearing lasted just under an hour. (Tr. 149-171)  At the outset, the ALJ remarked, "Now I see you are without an attorney and [INAUDIBLE] had a previous attorney [INAUDIBLE] retain an attorney so I assume you are ready to presume to proceed without an attorney at this time?" (Tr. 149)  After Owensby responded affirmatively, the ALJ stated, "Okay and your rights regarding having an attorney were explained to you by Judge Reed [INAUDI-

---

[2]The record includes a five-page transcript of the hearing transcribed by Free State Reporting, Inc. (Tr. 142-146) This document erroneously indicates on the cover sheet that the hearing took place on March 3, 2006. After only two and a half pages of testimony, the transcript stops abruptly with a note indicating "CD ends." (Tr. 146) On December 15, 2006, the full transcript was provided as a supplement to the record. The supplemental certification form indicates that the transcript of the oral hearing was "not available when the administrative record . . . was certified on September 28, 2006." This transcript, prepared by Deposition Services, Inc., includes the correct date, but as noted, erroneously states that the hearing was held at "Gary-Orlando, Florida." (Tr. 147-172) There are several inconsistencies between the common pages of the transcript which, purportedly, should be the same. These inconsistencies include the start time of the hearing, the name of the previous judge mentioned, and the name of the woman who handed Owensby the form to sign. There also are more "inaudible" sections in the supplemental transcript than there are in the partial transcript. For purposes of clarity in this opinion, only the supplemental transcript will be referenced.

BLE] is that correct?[3]" (Tr. 149)  The ALJ then asked a "Ms. Harrison" to hand Owensby a form. (Tr. 149)  According to the transcript, Owensby signed and dated the bottom, but "Ms. Harrison" filled out the top half for him[4]. (Tr. 149)  Owensby responded that he understood what it stated. (Tr. 150)  This ends the discussion at the hearing regarding Owensby's right to counsel.

During the hearing, Owensby testified about his unsuccessful attempts to find and keep subsequent employment. (Tr. 154-55) When the ALJ asked him if he had any hobbies that he could turn into a business, Owensby responded that he used to play guitar and still loved to play, but he was not able to hold the guitar for more than an hour. (Tr. 156)  Owensby testified that he had not been to the chiropractor since April of 2001, and had not attended physical therapy because of "grievous pain" and problems at his job. (Tr. 157)  Owensby indicated that he currently was getting some medical attention and medication from the VA. (Tr. 159-162)

When questioned about daily life, Owensby described life in the shelter as a "dorm atmosphere" where a person is assigned a "chore" every week.  (Tr. 162) Owensby described his recent chore as a few minutes of mopping the hallway. (Tr. 158)  During the hearing, the ALJ told Owensby that "just standing doesn't bother

---

[3]Presumably "Judge Reed" is ALJ Dennis R. Greene who formerly was assigned to Owensbyís claim. (*See* Tr. 44)

[4]Presumably "Ms. Harrison" is the hearing monitor Toya Patterson (*See* Tr. 149)

you very much does it?"  (Tr. 165)  Owensby responded that he
could not stand for more than a couple of hours, and he proceeded
to explain how when "watering the grass" at the mission he "had a
chair out there" because he could not stand for too long. (Tr.
165)

The ALJ spent considerable time on the question of why
Owensby was late to the hearing and what he told an unnamed
security guard and/or the hearing monitor. (Tr. 166-67)  The ALJ
stated that "we talked before as to why you were 25 minutes late
getting here.  As you recall we, we had a problem that you know
[INAUDIBLE] then later on it was not that problem but it was a
problem of not being able to travel here [INAUDIBLE].  That,
that's true right [INAUDIBLE]?" (Tr. 166)  Owensby explained that
he had problems getting off at the correct bus stop.  (Tr. 166)
The ALJ began to question Owensby on what he told Patterson, the
hearing monitor, prior to the start of the hearing. (Tr. 166)
Owensby claimed that he "must have misunderstood their question."
(Tr. 167)  The ALJ then said, "Ms. Patterson you're not under
oath but just generally was it your impression that the claimant
misunderstood what [INAUDIBLE]?" (Tr. 167)  Next, the ALJ asked
Patterson if Owensby said he was late because his attorney never
showed up.  In a rather confusing portion of the transcript,
Patterson responded,

> As I stated earlier upon, when I walked out
> of the door of the hearing room and I asked
> Mr., excuse me, I asked Mr. Owensby was he
> late due to the fact that his attorney stood
> him up, or actually sir I said did you tell,

13

> did you say that you were late because your
> attorney stood you up, he says yeah, he said
> yes.  I was repeating what the security guard
> told me.

(Tr. 167)

At that point, Owensby's portion of the testimony abruptly ended, and the VE's testimony began.

The ALJ provided a hypothetical based on a person with the age, education, and work experience of Owensby, with no climbing of ladders, ropes or scaffolds, occasional climbing of stairs and ramps, occasional twisting, and providing for a position that would not keep the neck fixed for a frequent amount of time. (Tr. 169)  The VE indicated that Owensby would not be able to do his past work and that there would be no skills transferable to other jobs. (Tr. 169)  The VE then indicated that Owensby could do work as a sales clerk, a cashier, or a gate guard for which there were a combined 211,482 jobs available in the regional economy. (Tr. 169)  When the hypothetical was altered to provide jobs done primarily in the standing position, the VE responded that for light jobs with a sit/stand option the person also could work in inspection. (Tr. 170) The VE testified that a total of 16,386 jobs were available in the regional economy. (Tr. 170)

The ALJ denied benefits in a written decision on March 13, 2006. (Tr. 14-19)  At step three, the ALJ concluded that Owensby had a severe impairment related to degenerative changes of his lumbar and cervical spines. (Tr. 16)  However, at step four, the ALJ noted that he accepted the implied assessment of the State

14

agency, which found no severe impairment.  (Tr. 17)  He then concluded that Owensby did not have an impairment or combination of impairments that met or equaled any listing, in particular "Listings 1.00 02 11.00." (Tr. 17)  The ALJ also found that, while Owensby's medically determinable impairments reasonably could be expected to produce the alleged symptoms, his statements concerning the intensity, duration, and limiting effects were not entirely credible. (Tr. 17)  In support of his credibility determination, the ALJ stated that the medical evidence did not fully support Owensby's complaints of pain because there was no neurological deficit, no motor deficit, and no deficit in range of motion. (Tr. 17)  The ALJ also stated that Owensby was not credible because he arrived at the hearing 25 minutes late and provided differing reasons as to his tardiness when questioned. (Tr. 17)  The ALJ stated:

> Moreover, I cannot find the claimant entirely credible.  The claimant arrived at the hearing 25 minutes late.  He initially stated that he was late because his attorney had failed to arrive for an appointment.  When it was noted to him that this attorney had notified me more than a week before the hearing that he was not accepting his appointment as a representative on this claim, the claimant changed his story and alleged that he was late because the bus driver had failed to notify him of the proper stop. It seemed that the claimant was attempting to make himself look righteous without much regard for the truth.
>
> (Tr. 17-18)

In addition, the ALJ noted that Owensby admitted to mopping

15

the hallway of his residence each morning, mowing the grass at
his church, and traveling significant distances by public trans-
portation. (Tr. 18)  The ALJ stated that Owensby admitted he
probably could perform work as a telemarketer. (Tr. 18)  Finally,
the ALJ noted that he generally adopted the assessment of Dr.
Javors, the only examining source that provided an opinion on
Owensby's RFC.  The ALJ then stated that he did not accept the
opinion of the State agency of no severe impairment because the
State agency physicians had not seen the report of x-ray evidence
available to Dr. Javors. (Tr. 18)

The ALJ noted that Owensby was unable to perform past
relevant work. (Tr. 18)  However, the ALJ concluded that Owensby
was not disabled because even with his limitations there were
86,508 cashier jobs, 9,725 gate guard jobs, and 16,386 inspector
jobs that Owensby still could perform available in the regional
economy. (Tr. 19)

Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence.  42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex
rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Sub-
stantial evidence has been defined as "such relevant evidence as

a reasonable mind might accept to support such a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NLRB*,
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).
*See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003);
*Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's
decision must be affirmed if the findings are supported by
substantial evidence and if there have been no errors of law.
*Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v.
Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the
decision cannot stand if it lacks evidentiary support or an
adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those
individuals who can establish "disability" under the terms of the
Social Security Act.  The claimant must show that he is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

> 42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
§404.1520.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. §404.1520(b).  If he is, the claimant is not disabled

17

and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Owensby first objects to the ALJ's conclusion that his allegations were not fully credible.  This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006); ***Jens***, 347 F.3d at 213.  The ALJ's

"unique position to observe a witness" entitles his opinion to great deference. ***Nelson v. Apfel****,* 131 F.3d 1228, 1237 (7th Cir. 1997). However, an ALJ must provide "specific reasons" for the finding on credibility that are supported by the evidence in the case record. ***Zurawski v. Halter***, 245 F.3d 881, 887 (7th Cir. 2001). The reasons for the ALJ's finding cannot be implied. ***Golembiewski v. Barnhart***, 322 F.3d 912, 916 (7th Cir. 2003). An ALJ's credibility determination is not entitled to deference where his findings are not explained in a way enabling meaningful review. *See* ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002); Social Security Ruling 96-7p. Additionally, an ALJ's credibility finding is not binding if it is based on errors of fact or logic. ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); ***Scheck v. Barnhart***, 357 F.3d 697, 703 (7th Cir. 2004). An ALJ is precluded from ignoring testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding. ***Schmidt***, 395 F.3d at 746-47. If there is at least some medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objec-

tive evidence.  ***Carradine v. Barnhart***, 360 F.3d 751, 753 (7th Cir. 2004).  "If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."  ***Carradine***, 360 F.3d at 754.  In evaluating subjective complaints of pain when a claimant indicates that pain is a significant factor of his alleged inability to work:

> [T]he ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (Internal citations omitted).
>
> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994)

*See also* ***Zurawski***, 245 F.3d at 887-88.  When an ALJ discounts a claimant's complaints of pain because they are not consistent with the objective evidence, he must be "sufficiently specific" as to the weight given to the individual's statements and the reasons for that weight.  ***Zurawski***, 245 F.3d at 887.  "[T]he ALJ must 'build an accurate and logical bridge from the evidence to [his] conclusion.'" ***Zurawski***, 245 F.3d at 887 (*quoting* ***Clifford v. Apfel,*** 227 F.3d 863, 872 (7th Cir. 2000)).

Owensby disagrees with the ALJ's credibility finding on

several grounds.  Initially, he faults the ALJ for making the credibility determination in reliance on hearsay evidence, taken from someone who was not under oath, during a conversation that took place off the record.

In general, administrative hearings are not governed by the rules of evidence.  "Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."  42 U.S.C. §405(b)(1).  As long as hearsay statements are relevant and material, they are admissible.  *Keller v. Sullivan*, 928 F.2d 227, 230 (7th Cir. 1991).  When hearsay evidence is the sole basis for agency action, a multifactor test is used to determine the reliability and probative value of that hearsay evidence.  *Meyers v. Secretary of Health and Human Services*, 893 F.2d 840 (6th Cir. 1990) (*citing* *Richardson*, 402 U.S. at 402-06, 91 S.Ct. at 1427-30.  When that hearsay evidence does *not* constitute substantial evidence supporting an administrative decision, it may be used by the ALJ as part of his analysis.  *Meyers*, 893 F.2d at 846.  However, 20 C.F.R. §404.950(e) states that "[witnesses] shall testify under oath or affirmation, unless the administrative law judge finds an important reason to excuse them from taking an oath or affirmation."

In his written decision, the ALJ opined that he did not find Owensby entirely credible because he "arrived at the hearing 25 minutes late" and "changed his story" in an attempt "to make himself look righteous without much regard for the truth." (Tr.

21

17-18)  It appears from the transcript that the ALJ relied on
testimony from Patterson and/or an unnamed security guard to
bolster this opinion.  The hearsay testimony did not form the
*sole* basis for the ALJ's credibility decision, so it only needed
to pass the threshold test of materiality and relevance in order
to be considered properly.  Because conflicting statements by a
claimant relate to the claimant's credibility in general, the
consideration by the ALJ was proper.

However, the testimony contained in the record is confusing
to say the least.  In addition to the testimony of Patterson
relating to an unnamed security guard's comments, the ALJ re-
ferred to another conversation in which Owensby's attorney "had
notified [the ALJ] more than a week before the hearing that he
was not accepting [Owensby's] appointment as a representative on
this claim."  There is no indication of any such conversation in
the record.  Such an omission leads this court to conclude that
at least part of the ALJ's credibility determination was based on
an incomplete record.  *See* ***Zurawski***, 245 F.3d at 887 (credibility
determinations must contain specific reasons, *supported by
evidence in the case record*)(*emphasis added*).  Moreover, the
court is disturbed by the fact that the ALJ openly acknowledged
that Patterson was not under oath, yet he proceeded to garner her
testimony regarding Owensby's veracity without providing an
"important reason" to excuse her from taking such an oath.  The
ALJ disregarded 20 C.F.R. §404.950(e) when doing so.

Owensby next argues that the ALJ based his credibility

22

determination on incorrect inferences or errors of fact.  The ALJ
stated that Owensby admitted to "mowing the grass at his church."
However, the record reveals no such admission.  Rather, when
asked whether standing bothered him, Owensby responded affirma-
tively and proceeded to explain how he had to use a chair when
watering the grass at his church. (Tr. 165)  This is the only
time grass is mentioned in the record.  Mowing the grass at his
church and watering the grass while seated in a chair are not
synonymous.  *See **Herron v. Shalala***, 19 F.3d 329, 335-36 (7th Cir.
1994) ("[L]ying down and napping are not synonymous with each
other, and therefore this testimony does not support the ALJ's
credibility determination.").  Further, the ALJ stated in his
credibility determination that the medical evidence did not show
"*any* deficit in range of motion."  This also is an incorrect
statement of fact.  Dr. Javors, whom the ALJ noted is the "only
medical opinion of an examining source" and whose opinion was
adopted, indicated in his report that "[Owensby] does have some
limitation to range of motion of the neck." (Tr. 17, 140)  *See*
**Brindisi ex. rel. Brindisi v. Barnhart**, 315 F.3d 783, 788 (7th
Cir. 2003) (*citing* **Herron** and "remanding determination when
credibility finding was based on facts that did not exist.").

     Finally, the ALJ mischaracterized several facets of Owens-
by's testimony.  The ALJ mentioned that Owensby "admits that he
mops the hallway of his residence each morning" and that he
"travels significant distances by public transportation."  (Tr.
18)  In reality, the record reveals that the mopping chore took

only two to five minutes each morning because the soap and water already were in the bucket from a prior user. (Tr. 158) Additionally, while Owensby did describe taking the bus to the Metro Center to get to the V.A. on one particular day and riding the bus to the hearing on another day, there never was an indication that he traveled significant distances by public transportation on a regular basis. (Tr. 162, 166) *See Carradine*, 360 F.3d at 756 ("[T]hese physical activities did not consume a *substantial part* of [claimant's] day . . ." and "are not necessarily transferable to the work setting with regard to the impact of pain.") (*emphasis in original*). Together, these misstatements create serious flaws in the ALJ's credibility determination that require remand. *See Allord*, 455 F.3d at 821 noting that "[w]hether [the ALJ] would have made the same determination had he not erred in these respects is speculative.").

Owensby also claims that the ALJ did not properly determine credibility pursuant to SSR 96-7p. This court agrees that the ALJ failed to develop fully his credibility analysis regarding Owensby's claims of pain. X-ray evidence showed significant degenerative disk disease that reasonably could support Owensby's claims. Therefore, the ALJ was not permitted to ignore Owensby's allegations. Rather, an ALJ must investigate all avenues as related to pain by asking specific questions regarding its affects. *See Luna*, 22 F.3d at 691; *Zurawski*, 245 F.3d at 887-88. Here, not only did the ALJ *not* specifically ask Owensby about pain regarding his daily activities, but on several occasions

during the hearing he cut Owensby off or changed the subject when
pain was mentioned.  At one point Owensby began to describe that
he was unable to attend physical therapy because of problems at
his job.  He stated, "[My] hours changed from night to days and
the pain that I was going through I was going through grievous,
grievous pain too so I was trying to prioritize - -" (Tr. 157)
Instead of questioning Owensby regarding the pain, the ALJ cut
him off and again asked why he had not attended the therapy. (Tr.
157)  Later, the ALJ asked Owensby whether there was anything
else he wanted to tell him about his situation.  Owensby began to
describe his "flare ups" and plans to attend physical therapy in
the future. (Tr. 163)  The ALJ responded by saying, "Well what
about the V.A.  You got the V.A. for you.  Is [INAUDIBLE]?" (Tr.
163)  He then proceeded to tell Owensby that "all they're telling
you is you got high cholesterol . . . you're almost 55 so that's
almost to be expected.  You know people start taking medication
[INAUDIBLE] I'm sure they told you you know that not so much
butter anymore and all that kind of stuff too right?" (Tr. 163-
64)  The only other time pain was mentioned by the ALJ was when
he posed further leading questions regarding sitting versus
standing.  The ALJ stated, "Okay.  But just standing doesn't
bother you very much does it?" (Tr. 165)  Owensby responded that
it did and talked about watering the grass from a chair. (Tr.
165)  The ALJ then proceeded to state:

         Okay this other doctor here [INAUDIBLE] he

doesn't really mention a problem with stand-
ing.  Do you feel, it's the same thing you
told both doctors you know that working in
front of a computer irritates your neck and
you told the second doctor just a couple
months ago that you didn't have any arm or
leg symptoms, the neck is the worse part of
it.  The neck caused you pain all the time
and it's aggravated when you sit in one posi-
tion such as watching T.V. or working on the
computer.  [INAUDIBLE].  You said the back
bothers you when he's, when you're doing
something really heavy and sometime you're in
pain for a long period of time in one place.
That's about it.  That sounds like what you
told him?

(Tr. 165-66)

After this characterization of the evidence by the ALJ, Owensby
responded "Yes, Your Honor.  I'm in pain right now." (Tr. 166)
The ALJ then abruptly changed the subject to Owensby's tardiness
in arriving at the hearing.

   Here, the ALJ overlooked clear statements in the record
which indicate that Owensby told his doctors of constant pain
more significant than those pointed out by the ALJ in his ques-
tioning or decision.  For example, Owensby told Dr. Patel that he
could "currently hold his head up for approximately four hours,
but then he has pain and weakness and needs to lie down." (Tr.
133)  He also told Dr. Javors of an aggravating back problem that
bothered him "if he stands for a long period of time in one
place." (Tr. 139)  The ALJ provided no rationale in his decision
for relying on some of Owensby's statements to his doctors but
overlooking others.  *See* ***Zurawski***, 245 F.3d at 888 ("Here, we are
unable to tell whether the ALJ investigated 'all avenues' that

relate to [the claimant's] complaints of pain because her deci-
sion offers no clue as to whether she examined the full range of
medical evidence as it relates to his claim.") (*emphasis in
original*).

Regarding the effectiveness and dosage of any pain medica-
tion, the ALJ did elicit information from Owensby about his blood
pressure medication and sleeping pills.  The ALJ then stated,
"[O]h I'm sorry are there any more medications sitting around or
is that it?" (Tr. 161)  Owensby proceeded to explain that he used
Ibuprofen to control the flare ups. (Tr. 161)  The ALJ asked,
"Okay what else you got?" (Tr. 161)  Owensby's specific medica-
tion response was inaudible, but it was stated that he was "not
taking that anymore."  The ALJ then asked another inaudible
question to which Owensby responded "Codeine." (Tr. 162)  The
record is unclear as to what the Codeine and unnamed drug were
used for.  In his determination, the ALJ simply stated that at
the time of his examinations Owensby "was taking no more than
over-the-counter pain medications." (Tr. 17) Because the record
and transcript are unclear as to the use of the Codeine and the
ALJ does not clarify the medication issue in his written deci-
sion, the record does not afford the opportunity for "meaningful
review." An incomplete record and confusing transcript coupled
with a failure to comply with Social Security Regulations, a
reliance on erroneous statements, and a mischaracterization of
facts is fatal to an ALJ's credibility determination as a whole.

Owensby further contends that the ALJ improperly assessed

27

his RFC.  Residual Functional Capacity or RFC is that which a
claimant still can do despite his limitations.  ***Hickman v. Apfel***,
187 F.3d 683, 689 (7th Cir. 1999); 20 C.F.R. §404.1545(a).  The
ALJ must consider things such as the claimant's ability to lift
weight, sit-stand, walk, and push-pull in reaching this determi-
nation.  20 C.F.R. §404.1545(b).  From this analysis, the ALJ
must determine the claimant's level of remaining potential work
activity.  The findings must be supported by substantial evidence
in the record.  ***Clifford***, 227 F.3d at 873.

     Here, the ALJ found Owensby had the RFC to perform "light
work" further limited by "a prohibition from climbing ropes,
ladders and scaffolds; no overhead reaching, and no twisting
beyond occasionally." (Tr. 17)  The ALJ did not mention any
restrictions involving weight or lifting.  However, according to
20 C.F.R. §404.1567(b), light work involves "lifting no more than
20 pounds at a time with *frequent lifting* or carrying of objects
weighing up to 10 pounds" (*emphasis added*).  While the ALJ
specifically stated that he adopted Dr. Javors' opinion as the
"only medical opinion of an examining source," he did not include
Dr. Javors' limitation which stated that he would not recommend
anything "involving repetitive, constant, or *frequent* bending,
*lifting*, or twisting to the lower back, and no lifting up over
twenty pounds." (*emphasis added*) (Tr. 17, 141)  This limitation
directly contradicts the definition of light work.  The ALJ
neither addressed the contradiction nor provided an explanation

28

for disregarding this portion of Javors' assessment.  *See **Clifford***, 227 F.3d at 873-74.

Owensby next argues that the ALJ failed to inquire if the testimony of the VE was consistent with the Dictionary of Occupational Titles ("DOT") and that the ALJ failed to resolve a conflict between the VE's testimony and the DOT.

Social Security Ruling 00-4p states that "before relying on VE or VS evidence to support a disability determination or decision, [the ALJ] must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT)."  SSR 00-4p.  The ruling's language sets out an "affirmative duty" on the part of the ALJ to ask about any possible conflicts between the VE's testimony and the DOT.  ***Prochaska***, 454 F.3d at 735.  "[T]he ALJ must ask the expert how his or her testimony *as to the exertional requirement of identified jobs* corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point."  ***Prochaska***, 454 F.3d at 735 (*emphasis added*).

Owensby contends that the ALJ failed to meet his affirmative duty regarding the initial questioning of consistency.  The court agrees that the ALJ did not meet the requirements of SSR 00-4p.  The transcript reveals that the ALJ asked how Owensby's past work was described in the DOT. (Tr. 168)  The VE responded that this past work "would also be consistent with the DOT [INAUDIBLE] would be light work available for mail clerk as well." (Tr. 168)

However, this questioning was *before* any hypothetical was posed by the ALJ and before the VE provided any testimony regarding potential jobs that a person with Owensby's limitations had the capacity to perform. (Tr. 168-69)  The ALJ did not address DOT consistency at all with regard to the exertional requirements of the hypothetical jobs posed by the VE.  The ALJ made a passing reference to his "affirmative duty" without correctly applying this required question to the appropriate line of testimony.

The Commissioner argues that it does not matter that the ALJ only was inquiring about Owensby's *past* work when the question was brought up.  However, raising the issue of DOT consistency at an irrelevant stage of questioning does not comply with the requirements set forth in SSR 00-4p.  The issue of DOT consistency must be raised at the appropriate and relevant time during the testimony or the clear affirmative duty placed upon the ALJ is meaningless.  Here, the ALJ has failed to meet his affirmative burden.

Further, the VE's testimony is far less than thorough.  No specific DOT numbers are mentioned by the ALJ or the VE.  While a recitation of DOT numbers is not specifically required by SSR 00-4p, meaningful review is not possible in an instance such as this where there are inconsistencies in the testimony and decision that are not resolved.  For example, the ALJ stated in his decision that the "vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (Tr. 19)  Yet, as Owensby correctly stated, the ALJ

30

indicated "no overhead reaching" as part of his hypothetical statement during his questioning of the VE and in his RFC assessment. (Tr. 17, 171)  The DOT indicates that a gate guard position may require reaching occasionally, yet the VE indicated that a person with Owensby's limitations would be able to perform the gate guard job.  Thus, a potential conflict exists.  While the Commissioner is correct in saying that the ALJ limited only overhead reaching and not all reaching, his assumption that activities such as issuing passes or answering the telephone would only require some "minimal reaching forward" is not clear on the face of the record.  The ALJ was required to inquire into this conflict.  *See* ***Prochaska***, 454 F.3d at 736 ("It is not clear to us whether the DOT's requirements include reaching above shoulder level, and this is exactly the sort of inconsistency the ALJ should have resolved with the expert's help.").

Moreover, the ALJ did not discuss the light work requirement of "frequent lifting or carrying of objects weighing up to 10 pounds" with the VE at all.  This is a significant omission as the only doctor that the ALJ relied on for an RFC stated that there should be no "repetitive, constant, or frequent bending, lifting, or twisting to the lower back."  Thus, the ALJ did not fully comply with the requirements of SSR 00-4p.

Owensby also challenges the ALJ's conclusion that his condition did not meet or equal an impairment listed under 20 C.F.R. Part 404.  A claimant is eligible for benefits if he has an impairment that meets or equals an impairment found in the

31

Listing of Impairments. 20 C.F.R. §404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668-69 (7th Cir. 2004).  *See also Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006).  Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue. *See* 20 C.F.R. §404.1526(b) ("Medical equivalence must be based on medical findings."); *Barnett,* 381 F.3d at 670.  The ALJ must build a logical bridge in his decision from the evidence to his conclusion.  "We have repeatedly admonished ALJs to sufficiently articulate [their] assessment of the evidence to assure us that [they] considered the important evidence and . . . to enable us to trace the path of [their] reasoning." *Scott,* 297 F.3d at 595 (*internal citation omitted*).

Owensby claims that the ALJ's analysis of the Listing Impairment determination was inconsistent, counterintuitive, and indicates a lack of full consideration by the ALJ.  This court agrees with Owensby.  In step three of his decision, the ALJ stated that x-ray evidence showed that the claimant did have a "severe impairment" of degenerative changes to his lumbar and cervical spines. (Tr. 16)  In step four, the ALJ stated that "[s]ince no neurological or motor loss has been demonstrated in the relevant record, I accept the implied assessment of the State

agency, which found no severe impairment, that the claimant does
not have an impairment that meets or equals any Listing, in
particular Listings 1.00 02 11.00." (Tr. 17)  No further analysis
or explanation is provided by the ALJ regarding this finding.
The ALJ adopted Dr. Javors' opinion as the "only medical opinion
of an examining source" and then went on to say that he did "not
[accept] the opinion of the State agency of no severe impairment"
because the physicians had not seen the x-ray evidence. (Tr. 18)

      Not only was the ALJ's determination perfunctory, but he
also provided conflicting evidence regarding the use of medical
opinions upon which he based his findings.  The ALJ rejected,
then accepted, then rejected again the "implied assessment" of
the State agency.  Other than a conclusory statement regarding
the lack of x-ray evidence, the ALJ did not address these incon-
sistencies.  He also did not indicate that he consulted any other
medical expert regarding equivalency of the Listing Impairment
except Dr. Javors, who himself did not provide such an assess-
ment.  *See Barnett*, 381 F.3d at 671 ("Yet, rather than soliciting
a neurologist's opinion on the matter, the ALJ simply assumed the
absence of equivalency without any relevant discussion.  That
assumption cannot substitute for evidence and does not support
the decision to deny benefits.").

      The Commissioner claims that the ALJ's analysis was satis-
factory because the record showed no evidence of the required
neurological or motor loss.  However, this statement from the ALJ
does not adequately address the record as a whole or the require-

ments of a particular listing. In his decision, the ALJ concluded that Owensby did not meet the requirements of any listing, "in particular listing 1.00 02 11.00." (Tr. 17) It is not clear from this reference which listing the ALJ has attempted to reference. Perhaps he generally has considered those listings at Pt. 404, Subpart P 1.00 (musculoskeletal system), 2.00 (special senses and speech), and 11.00 (neurological). The Commissioner, in his response, assumes the ALJ based his decision on the listing at 1.04, Disorders of the Spine, which provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> >
> > B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
> >
> > C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting

in inability to ambulate effectively, as
defined in 1.00B2b.

The Commissioner argues that the ALJ reasonably concluded
that, because the record contained no evidence of neurological or
motor loss, Owensby's impairment did not meet this listing.
However, this brief conclusion, coupled with uncertainty over
which listings the ALJ considered, fails to address the framework
laid out by the listing.  *See Scott*, 297 F.3d at 595 ("By fail-
ing to discuss the evidence in light of [Listing's] analytical
framework, the ALJ has left this court with grave reservations as
to whether his factual assessment addressed adequately the
criteria of the listing.").  Together, these factors confirm that
the ALJ's Listing Impairment decision is insufficient based on
the record.  *See Barnett*, 381 F.3d at 670 ("Ultimately, though,
even apart from the ALJ's misapprehension of the evidence, we
would conclude that his two-sentence consideration of the Listing
of Impairments is inadequate and warrants remand.").

Finally, Owensby contends that he did not knowingly and
intelligently waive his right to counsel.  A claimant has a
statutory right to be represented by counsel at a disability
hearing.  *See* 42 U.S.C. §406; 20 C.F.R. §404.1700; *Skinner v.
Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Binion v. Shalala*, 13
F.3d 243, 245 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d
581, 584 (7th Cir. 1991).  However, a claimant may waive his
right to counsel if properly given sufficient information to
enable him to decide intelligently whether to retain counsel or

35

proceed *pro se*.  ***Thompson***, 933 F.2d at 584.  To ensure a valid
waiver, an ALJ must explain to *pro se* claimants "(1) the manner
in which an attorney can aid in the proceedings, (2) the possi-
bility of free counsel or a contingency arrangement, and (3) the
limitation on attorney fees to 25 percent of past due benefits
and required court approval of the fees." ***Skinner***, 478 F.3d at
841 (*citing **Binion***, 13 F.3d at 245; ***Thompson***, 933 F.2d at 584).
"Moreover, when the claimant is unrepresented, the ALJ has a duty
to 'scrupulously and conscientiously probe into, inquire of, and
explore for all relevant facts.'" ***Nelson***, 131 F.3d at 1235 *(quot-
ting **Thompson***, 933 F.2d at 585).  The ALJ has the same heighten-
ed, scrupulous, and conscientious duty to develop the record when
a plaintiff is without counsel regardless of whether the waiver
of counsel was valid or invalid.  *See **Nelson***, 131 F.3d at 1235;
***Binion***, 13 F.3d at 245.

Owensby claims that he was not properly advised of his right
to counsel by the ALJ.  He contends that his waiver was not valid
because these standards were not followed by the ALJ.  This court
agrees that the ALJ's brief and vague statements at the beginning
of the hearing do not comport with the standards set out by the
Seventh Circuit.  While a waiver form is mentioned, a signed form
is not provided in the record, nor are any details provided
regarding a former "explanation" to Owensby by "Judge Reed." (Tr.
149)  Further, although reference is made to printed material
provided to Owensby, because all of this material is not in the
record, the court cannot gauge its sufficiency. Further, regard-

36

less of the doubt over the validity of this waiver, this order makes clear that the ALJ's decision was not based on a full picture of the record.  The credibility determination lacked thoroughness, the VE's testimony was not sufficiently probed, no testimony from or questioning of a medical expert was provided, and there were inconsistencies in the Listing Impairment analysis and the RFC determination.  Had Owensby been able to secure counsel in time for the hearing, some of these issues may have been addressed.  Instead, the ALJ used superficial and leading questioning during many portions of the hearing to evaluate Owensby's disability.  *See **Thompson***, 933 F.2d at 586 ("The ALJ's manner of questioning might have been appropriate for cross-examination in an adversary proceeding, but insufficient for an ALJ with the heightened duty, to an unrepresented claimant, to develop the record by scrupulously and conscientiously probing for all relevant facts."). Though Owensby is currently repre-sented and this issue may be moot, on remand the ALJ is reminded of his burden to base his decision on an accurate picture of the record, consistent with this opinion.

————————————

For the reasons set forth above, the decision of the Commis-sioner is **REVERSED** and **REMANDED**.

ENTERED this 5th day of November, 2007

s/ ANDREW P. RODOVICH
United States Magistrate Judge